Carl WASHINGTON, Plaintiff in Error,

v.

The STATE of Oklahoma, Defendant in Error.

No. A–12240.

Criminal Court of Appeals of Oklahoma.

Jan. 18, 1956.

Conyers & Conyers, Tulsa, for plaintiff in error.

Mac Q. Williamson, Atty. Gen., Lewis A. Wallace, Asst. Atty. Gen., for defendant in error.

BRETT, Judge.

The plaintiff in error, Carl Washington, defendant below, was charged by information in the District Court of Tulsa County, Oklahoma, of having committed the crime of rape upon the person of Marion Joyce Bell, a female person not his wife, by means of force and fear. He was tried by jury, convicted, and found guilty. The jury's verdict fixed his punishment at thirty years in the state penitentiary. Judgment and sentence was entered in accordance with the verdict, from which this appeal has been perfected.

The first contention of the plaintiff in error is that the judgment and sentence is contrary to law and the evidence. This objection to the judgment and sentence is inclusive of the proposition urged by the defendant that there was not sufficient corroborative evidence of the prosecutrix' story to prove the defendant was guilty of rape. To resolve these issues, it is essential that we give a brief statement of the evidence.

Marion Joyce Bell, twenty years of age, the prosecutrix herein, lived in Tulsa, Oklahoma. For three years, she had known Marsha Cooper, a man twenty-three years of age and a grand larceny probationer. The record discloses she was not aware of the fact that though she had been keeping company with him, he had been married since November, 1954, and that he was the father of a child, a girl. On December 14, 1954, Cooper, at 7:15 in the evening, came by her house and asked her to go out with him. They left, ostensibly, to go get some barbecue. When she left her house, she did not know any one else was with Cooper until she approached the automobile and saw the defendant, Carl Washington, sitting in Cooper's automobile. She asked Cooper who he was and why he was there. She was informed he was going to pick up his girl friend. She got into the automobile and later observed two men in the back seat; Eugene Jackson, sixteen years of age, and Raymond Ferguson, eighteen years of age. They left in the automobile but did not go anywhere for the barbecue, according to the prosecutrix, or to get anything else or anybody else. They immediately drove to West Tulsa and five miles west on a Tulsa County road. The prosecutrix said she repeatedly asked them to take her home but Cooper refused, as did the defendant, Washington. Instead, they proceeded to engage in drinking the contents of a fifth of wine and upon its being consumed, they threw it out the window. The prosecutrix asked Carl Washington to take her home, since he was driving. He said, no (the language herein after used is not the language of the defendant and his cohorts, it is unprintable), he wanted to have intercourse with her. Cooper also said he wanted to do the same thing and the prosecutrix said, let's get out of the car. (Subsequent events discloses the reason for her suggestion.) So the car was stopped and Cooper held her tight and she testified she told him to turn her loose. Washington, believing Cooper was having some difficulty, got out of the car. The evidence discloses the Bell girl said, "Let's walk down the road," and Cooper turned her loose and she started running

and lost a shoe and her cigarettes. Washington overtook her, caught her, and brought her back. Washington threw her around and she almost fell, Cooper got in the automobile, backed it up to where she and Washington were, and Washington threw her in the automobile. Then they went down the road and found her shoe. She denied that at any time that night did they have a flat tire. . At this point she testified Ferguson said, "Let's take the 'bitch' up the hill." While this was being done, she observed a light up the road and asked Cooper to drive in that direction. (It is apparent her object in wanting to go by that house was to possibly make an outcry. Her situation was such that an outcry would have done no good, unless someone could have heard it.) The complainant then testified Cooper grabbed her and told her to open up her legs and he got on her and had intercourse with her. Then, she related that Washington, in substance, said, "That's enough, let me do it to the 'bitch'." Before Washington started in, he said he could not do it in the front seat, so Cooper and the two men in the back seat lifted her over the front seat and threw her in the back seat and then Washington did it to her a long time and then he would start in again. He got off and Ferguson did it and then Washington did it again and Jackson did it also. When Washington was in operation, she testified, Jackson, Cooper, and Ferguson held her left leg over the front seat. Ferguson struck a match and said, "I am going to burn the 'bitch's' hairs off." She recounted she fought and kicked and the match went out. The record discloses that all the time she was giving this testimony, she was overcome with grief and crying and at times her voice would fade out. She recounted another match was struck and held close and Ferguson said, "Look at her." They pulled her legs apart further and Ferguson spat in her and then Washington got on her and began again. The Bell girl said she kicked so he couldn't do it and he told her, "If you don't lay down, I'll break your neck." She tried to raise up again and he told her to lay down and she did. She related that Washington penetrated her during these operations. This round of intercourse continued until all the boys did it several times. All during the proceeding, the record shows, she asked to be taken home. As a ruse to get away and escape further abuse, the prosecutrix testified she suggested they go back to town and get a room in a hotel and she would stay with them. This suggestion met with ready response and they returned to Tulsa. One of them went into the Miller Hotel and rented a room. The plan was that they would then take her in and go in one at a time to allay suspicion. When Raymond Ferguson took her into the hotel, Mr. Miller, the proprietor, was standing behind the desk. She said to Mr. Miller, "Please don't let these boys bother me, they have been raping me all night." When she said that the boy ran out and Mr. Miller called her father for her and told her she could stay at the hotel until her father came. She positively denied that she had given Washington or any of these boys her consent to have intercourse with her. She related she had never been married and had never had intercourse before, with anybody. She did not know that the defendant, Washington, or Cooper were married. She testified positively the only reason she had intercourse with Washington was because he made her.

Dr. Mary Edna Sippel, a graduate of Kansas University Medical School and duly licensed practicing physician in Oklahoma, testified that the prosecutrix had been a patient of hers and that she examined the girl on December 6, 1954. This examination, she testified, was both external and internal of the genital organs, that the hymen was in place, that the Bell girl had never had intercourse at that time, and that she was a virgin. She further testified that on December 18, 1954, she again examined the Bell girl both externally and internally and she found she had had sexual intercourse. Miss Bell was bruised on the external parts of her privates and she bore scratches and the surface was as though it had been scraped off like an ulcer. The hymen was broken and there were raw, unhealed edges on the broken parts.

The defendant denied having intercourse with the Bell girl but Cooper said he did. They all testified that the Bell girl gladly accompanied them, that they drove around and tried to find some other girls, and that the Bell girl wanted to find some whiskey. They testified they stopped and got some corn whiskey and a fifth of wine. They went out into the country and had a flat. Here they drank the wine and whiskey and threw the wine bottle out of the car. While Ferguson and Washington were fixing the flat, they testified, Jackson was on the back seat, asleep and Cooper admitted that he had intercourse with the Bell girl. No proof of the flat tire was made by way of evidence of its repair. Ferguson, Cooper, and Washington testified that the Bell girl was not out of the automobile. The Jackson boy was not called as a witness either for the prosecution or the defense. Washington and Ferguson denied that they had had intercourse with the Bell girl. They testified that they brought her back to town to the Miller Hotel because the Bell girl said she would be locked out at home but she could tell her father she spent the night with her sister.

A James Payton testified that as early as in 1952 he had intercourse with the Bell girl. He related they broke up quite a while before December 14, 1954. This testimony is in conflict with that of Dr. Sippel that the Bell girl was a virgin.

Mr. Miller substantially corroborated the story of the Bell girl in relation to what she told him when she came into the hotel with Ferguson. He testified that a boy and girl came in and the boy said he wanted to rent a room and he handed them the register to register. At that time the girl came around the counter and looked like she was trembling and she told the boy, "I am changing my mind." The boy looked at her and went out. "She put her head on my shoulder and said, 'This boy raped me, would you call my father?' and I said, 'You can call him'." He further testified, "She was scared to go out, and I said, 'You call him,' and about that time the lady walked in and I told her to call her father and she did." He further related that Joyce Bell was awfully nervous and scary and I could not get her to go out there and call over the phone at all. Finally, her father came with two officers. This was around 12:00 P.M. at the hotel on the night of December 14, 1954.

In rebuttal, police woman Mary Horn testified that on December 17, 1954, she accompanied the Bell girl to the scene of the first raping and there in the road she found the quart wine bottle and about one-half pack of Phillip Morris cigarettes. which the prosecutrix had identified as the brand of cigarettes she lost while trying to run away.

In our opinion, the foregoing record constituted sufficient evidence to support the jury's verdict. The defendant cites De Armond v. State, Okl.Cr., 285 P. 2d 236, in support of his contentions, the second syllabus therein reading as follows:

"Although conviction for rape may be sustained upon uncorroborated evidence of outraged female, appellate court will closely scrutinize testimony upon which conviction was obtained, and if it appears incredible and too unsubstantial to make it basis of judgment, will reverse judgment," otherwise the same will be affirmed.

We have carefully scrutinized the testimony upon which this conviction was obtained and it does not appear incredible and too unsubstantial to make it the basis of the judgment entered herein. The jury is the sole judge of the facts involving the guilt or innocence of the accused and when the record discloses facts, even though conflicting, which would have been sufficient to warrant a verdict of guilty, the same will be sustained on appeal. In such cases only errors of law will be reviewed. Sadler v. State, 84 Okl.Cr. 97, 179 P.2d 479, Fields v. State, Okl.Cr., 284 P. 2d 442, Armstrong v. State, 61 Okl.Cr. 352, 68 P.2d 114, Horn v. State, 13 Okl.Cr. 354, 164 P. 683. The jury concluded that this defendant and his cohorts first procured their liquor before going by and picking this girl up and that Ferguson and Jackson hid themselves in the back seat until she was fenced in the front seat by Wash-

ington and Cooper. It was the jury's province to believe the prosecutrix' story that they immediately left for the country and they did not stop anywhere and that she repeatedly requested them to take her home. Then, like a pack of wild animals whose sense of propriety was dulled by the liquor they drank and whose passions were unrestrained by normal inhibition, they proceeded to make her the victim of their unrighteous lust. She tried as best she could to maneuver an escape but the defendant, Washington, pursued her and forced himself upon her, and twice thereafter, she resorted to her wits to try to avoid further abuse and finally succeeded at the hotel, her first opportunity to make an outcry where it could be heard. The jury, no doubt, concluded the whole venture was prearranged for the sole purpose of consummating the rape of this young woman. Her situation was a most difficult one. Her attackers were intoxicated, there were four of them, and as we said in Kidd v. State, 97 Okl.Cr. 415, 266 P.2d 992, 1004:

"The element of fear was greatly enhanced due to the fact that there were two men involved in this situation and not just one. This fact alone supplies an element of force, by numbers. Hence there was both force and fear."

What we said therein applies with greater force here.

When the rule in the De Armon case is applied to the evidence herein, the prosecutrix' evidence is not only probable, but convincing and is sufficient to support the jury's verdict and the judgment and sentence herein imposed.

■ Next, it is contended that Dr. Wade Sisler should have been permitted to testify regarding any statement made to him by the prosecutrix as to her condition or complaint. The record discloses that the prosecution witness was taken to the hospital, and early the next morning, she was examined by Dr. Sisler. Dr. Sisler, an orthopedic bone and joint specialist, only examined her externally. He said he pulled up her dress and looked at her privates. He saw no bruising of the vulva or tissue surrounding the vagina. His examination was superficial. The question was asked, "What did she say to you, Doctor?" Objection was interposed to the question and sustained. Then the Doctor was asked, "Did you ask her for a case history as to what had taken place while she was in the hospital?" To which objection was again interposed and sustained. This objection is predicated upon the record thus made. No objection or exception was saved to the court's ruling and no proffer was made by the defense as to what the Doctor's testimony would have been, had he been permitted to state what she told him. In the defendant's brief, it is stated that if such had been done, the Doctor's testimony would have been favorable to the defendant; but, we are not at liberty to consider such matters when they do not appear of record. It has been held that to preserve an available objection to the exclusion of testimony, a proper question must be asked, and when objection thereto is sustained, an offer must be made showing what testimony will be given if the witness is permitted to answer. This is proper in order to enable the trial courts to determine whether the testimony is competent and is necessary to present the question on appeal. Otherwise, the matter is not open for speculative inquiry on appeal. Roper v. State, 49 Okl.Cr. 21, 292 P. 875, Cheeves v. State, 18 Okl.Cr. 480, 196 P. 726, and numerous other cases cited therein. We are not at liberty to consider this objection herein, in absence of proper exception and offer of proof.

The defendant urges that one of the other participants in this crime was acquitted by another jury. We are not concerned with the outcome in that trial. Herein, a jury has heard the evidence, weighed it, and returned its verdict and there is sufficient evidence to support its finding. We are of the opinion that to take into consideration matters not in this record would be to commit an act unbecoming an appellate court. What may have occurred in the trial on one of the defendant's cohorts, or may occur in other trials of his other cohorts, is not a matter to be considered

by us in this appeal. We are here concerned only with the facts and law applicable in the situation at bar. We can find no legal grounds upon which to reverse or modify the proceedings had in this case.

Affirmed.

JONES, P. J., and POWELL, J., concur.